# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**WILLIAM M. DOUGHERTY,**                    Chapter 7
                                             Case No. 09-19055-JNF

                 Debtor
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**DANIELLE E. DEBENEDICTIS**,

                 Plaintiff

v.                                           Adv. P. No. 09-1369

**WILLIAM M. DOUGHERTY,**

                 Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the "Amended Complaint Under 11 U.S.C. §§ 523(a)(2) and 523(a)(15) and 523(a)(6) to Determine Debt Non Dischargeability of Debt [sic]" filed against William M. Dougherty ("Dougherty" or the "Debtor") by Danielle deBenedictis, the Debtor's former divorce counsel ("deBenedictis") through which she seeks a determination that the debt owed to her for legal fees is excepted from discharge. deBenedictis filed the Amended Complaint pursuant to Fed. R. Civ. P. 15, made applicable hereto by Fed. R. Bankr. P. 7015, following the first day of trial held with respect to her

1

original complaint which did not include a claim for willful and malicious injury pursuant

to 11 U.S.C. § 523(a)(6).  The trial was conducted over three days on March 5, August 29,

and September 27, 2013 at which six witnesses, including the Debtor and deBenedictis,

testified and numerous exhibits were introduced into evidence.  Following the trial, both

parties filed post-trial briefs.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 (a) and (b)

and the order of reference from the United States District Court for the District of

Massachusetts.  This is a core proceeding pursuant to 28 U.S.C.  § 157(b)(2)(I).  The Court

now makes the following findings of fact and conclusions of law pursuant to Fed. R. Bankr.

P. 7052.

## II. FACTS AND PROCEDURAL HISTORY

deBenedictis represented the Debtor from August, 2005 to late 2007 with respect to

a post-divorce complaint for modification of his alimony obligation to his former spouse,

Mary Boyle Dougherty ("Mrs. Dougherty"), in the Suffolk County Probate and Family

Court, Department of the Trial Court (the "Probate Court") in an action entitled Dougherty

v. Dougherty, Case No. SU 94D-1938.  As discussed in more detail below, the Debtor

incurred substantial legal fees for deBenedictis's services which he failed to pay.

The Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code on

September 24, 2009, and Joseph G. Butler was appointed as the Chapter 7 trustee (the

"Trustee").  On Schedule A - Real Property, the Debtor listed a condominium unit located

at 365 North Street, Boston Massachusetts (the "property") with a current value of $350,000

2

and a tax assessed value of $410,000, subject to liens in the amount of $439,520.47. On Schedule C - Property Claimed as Exempt, he claimed an exemption in the property in the amount of $500,000 pursuant to the Massachusetts Homestead Statute, Mass. Gen. Laws ch. 188. On Schedule D - Creditors Holding Secured Claims, he listed the following liens on the property: (1) a condominium fee lien in the amount of $2,462.35 in favor of Condo North VIII; (2) a real estate attachment in the amount of $116,665 in favor of deBenedictis (the "deBenedictis Attachment"); and (3) an execution in the amount of $335,640.47 in favor of Mrs. Dougherty.

On November 20, 2009, deBenedictis timely filed a complaint objecting to the dischargeability of the debt owed to her for outstanding legal fees. In the original complaint, she stated, *inter alia*, that she filed a collection action against the Debtor in Suffolk County Superior Court in 2008 and that court issued a trustee process order with respect to the Debtor's investment account at Moors & Cabot Investments ("Moors & Cabot"). She further alleged that the Debtor fraudulently withdrew all funds from that account after receiving notice of the hearing to be held in Superior Court on the trustee process motion. The two-page original complaint contained no separate counts but contained references to 11 U.S.C. § 523(a)(2) and (a)(15).

On December 18, 2009, the Debtor filed a Motion to Avoid Judicial Lien with respect to the deBenedictis Attachment on the property pursuant to 11 U.S.C. § 522(f). In response, deBenedictis filed an "Opposition of Creditor Danielle E. deBenedictis to William M. Dougherty's Motion to Avoid Judicial Lien and Objection to Debtor's Claim of a

3

Homestead Exemption" (the "Opposition").

The Trustee requested a bar date for the filing of proofs of claim. On January 19, 2010, deBenedictis timely filed a proof of claim asserting a secured claim against the property for "services rendered" in the amount of $116,665. She attached to the claim a copy of the deBenedictis Attachment which was issued by the Suffolk Superior Court on January 7, 2008.

On February 26, 2010, the Court issued a pretrial order with respect to the Motion to Avoid Lien. On December 28, 2010, the Court consolidated the Motion to Avoid Judicial Lien and the Opposition with the adversary proceeding. On January 5, 2011, deBenedictis and the Debtor filed a Stipulation of Dismissal in which she assented to the allowance of the Motion to Avoid Judicial Lien. In light of the Stipulation, the Court entered an order on January 11, 2011, allowing the Motion to Avoid Judicial Lien.

On June 8, 2012, the Trustee filed a Notice of Intention to Abandon the property pursuant to 11 U.S.C. § 554 which deBenedictis opposed. On June 29, 2012, the Debtor filed a motion seeking approval of the Trustee's abandonment of the property on an expedited basis to enable him to sell the property. deBenedictis opposed the Debtor's motion, asserting that the property should be preserved to satisfy any judgment she might obtain in the pending nondischargeability litigation. At a hearing held on July 17, 2012, the Court overruled deBenedictis's objection in light of the allowance of the Motion to Avoid Judicial Lien and pursuant to 11 U.S.C. § 522(c) which provides that exempt property is not liable during or after the commencement of a bankruptcy case for any debt that arose prior to the

4

commencement of a case.  Accordingly, the Court approved the Trustee's abandonment of the property.

Following several requests for extensions, the parties filed a Joint Pretrial Memorandum in the adversary proceeding on January 6, 2012. An initial trial date was set but was continued several times.  The Debtor and deBenedictis also moved to supplement the Joint Pretrial Memorandum on May 11, 2012 and May 14, 2012, respectively.  Several scheduling conflicts between the parties arose and were resolved, and the trial commenced on March 5, 2013.  Following the opening statements of counsel and the testimony of the first witness, Attorney Justin Maiona ("Attoney Maiona"), the Debtor's successor divorce counsel, the Court afforded deBenedictis the opportunity to file an amended complaint pursuant to Fed. R. Civ. P. 15, made applicable hereto by Fed. R. Bankr. P. 7015, to add a count under 11 U.S.C. § 523(a)(6).  The Court ruled that deBenedictis's reliance in the original complaint on 11 U.S.C. § 523(a)(15), which excepts from discharge certain non-domestic support obligations incurred in the course of a divorce or a separation proceeding owed to a spouse, former spouse or child of a debtor, was inappropriate.  The Court also questioned whether deBenedictis had a plausible claim for relief under 11 U.S.C. § 523(a)(2) because the evidence presented during the first day of trial did not indicate that the debt owed to her was incurred by fraud.  *See* Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955 (2007) and Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937 (2009).

On May 1, 2013, deBenedictis filed the Amended Complaint in which she alleged that the Debtor withdrew all funds from the Moors & Cabot account after he received

5

notice of a hearing to be held on her trustee process motion.  She alleged that his

withdrawal of those funds from the Moors & Cabot account was a violation of a court order

and "constituted a conversion and amounted to a willful and malicious injury to [her]

property under 11 U.S.C. § 523(a)(6), that is, the funds as to which she would have had a

trustee process, lien or attachment but for Debtor's conversion."  She also alleged that the

Debtor misrepresented his ability to pay for legal services rendered by her, that he

fraudulently stopped payment on checks he wrote to her and that the debt owed to her is

nondischargeable "for fraud and misrepresentation." Notwithstanding the Court's ruling

of March 5, 2013 on the first day of trial, the caption of the Amended Complaint referenced

11 U.S.C. § 523(a)(2) and (a)(15) in addition to § 523(a)(6).   Through the Amended

Complaint, deBenedictis seeks a determination that $87,488 in unpaid legal fees is

nondischargeable and that she is entitled to attorney's fees, costs and interest.

## III. THE FACTS ADDUCED AT TRIAL

The Debtor and Mrs. Dougherty divorced in the 1990s.  The Debtor engaged

deBenedictis in the summer of 2005 to represent him in connection with a post-divorce

complaint for modification.  At the time he consulted with deBenedictis, the Debtor had

an existing obligation to pay his ex-wife alimony based on a percentage of his income

pursuant to a divorce agreement.  Sometime afer the divorce, the Debtor sold his business

and received shares of stock in Boston Private Financial as consideration.  deBenedictis

testified that the Debtor hired her to present evidence to the Probate Court that the

consideration he received from the sale of his business constituted a marital asset and not

6

"income," which would have increased his alimony obligation.  On September 7, 2005, the
Debtor executed a Domestic Relations Fee Agreement with deBenedictis under which he
delivered to her a $10,000 retainer and agreed to pay her $400 per hour for legal services.

On February 13, 2006, deBenedictis issued the Debtor a bill in the amount of
$34,302.90 for fees incurred from August 18, 2005 through January 31, 2006.  She applied
the $10,000 retainer against that bill, and the Debtor paid the remaining balance.

deBenedictis testified that during the course of the litigation she repeatedly advised
the Debtor that the case "cried out for settlement" due to his potential exposure for
increased alimony to his ex-wife and for attorney's fees.  Notwithstanding deBenedictis's
advice, she maintained, the Debtor would not agree to settle and directed her to
aggressively pursue litigation.  In that regard, she said that she received constant direction
from both the Debtor and Attorney Marie Vaccarelli, who was his long time attorney and
with whom he had a personal relationship, to conduct lengthy and expensive depositions
of Mrs. Dougherty and her business associates.  deBenedictis believed these tactics were
unnecessary and unproductive and, she testified, they caused additional costs and
attorney's fees to be incurred by the Debtor.

The modification trial took place over several days beginning on February 14, 2006
and ending on August 3, 2006.  deBenedictis delivered the Debtor a further bill dated
November 10, 2006 for services rendered, including the modification trial, from February
1, 2006 through October 26, 2006 in the amount of $65,708.  The Debtor paid $6,000 toward
that bill, leaving a balance of $59,708.  She rendered further services and issued him

7

another bill dated September 7, 2007 for work performed from October 26, 2006 through April 15, 2007 in the amount of $26,660, leaving a balance owed of $86,308.

Following the trial, deBenedictis drafted a post-trial "Request for Findings of Fact and Conclusions of Law" as is customary in Probate Court practice. Attorney Vaccarelli, who had performed some post-trial legal work for the Debtor, was unhappy with deBenedictis's draft and insisted on adding information to the pleading. According to deBenedictis, Attorney Vaccarelli's edits were not in compliance with the Probate Court rules of procedure and contained inappropriate information and argument. deBenedictis maintained that a "big battle about the final filing" erupted among the parties, and Mrs. Dougherty's counsel ultimately moved to strike large portions of the final submission, resulting in further expense and increased tensions among the parties.

Over a year elapsed after the modification trial concluded without a final decision from the Probate Court. The Debtor grew anxious about the potential outcome. At one point, he asked deBenedictis to file a motion with the Probate Court to request a final ruling, which she refused to do. During the post-trial period, deBenedictis made repeated demands on the Debtor for payment of her outstanding legal fees. He failed to pay her and a fee dispute ensued. During the summer of 2007, deBenedictis had numerous discussions with Attorney Vaccarelli, whom the Debtor had authorized to mediate the fee dispute on his behalf, to resolve the matter. The Debtor wrote deBenedictis two checks, one dated August 30, 2007 in the amount of $40,000, and the other dated September 29, 2007 in the amount of $2,500, in an attempt to settle the dispute (the "Settlement Checks"). Attorney

8

Vaccarelli and deBenedictis engaged in settlement discussions over several months regarding whether the Debtor would agree to pay her additional money if the Probate Court rendered a judgment favorable to the Debtor in the modification matter and, if so, whether that obligation would be secured by a mortgage on the property. At one point, deBenedictis drafted a proposed settlement agreement, which included a provision for a mortgage in favor of deBenedictis, but the parties never executed it. deBenedictis did not deposit the Settlement Checks.

During the negotiations concerning the Settlement Checks and while still awaiting a decision from the Probate Court on the modification, the Debtor consulted with new counsel, Attorney Ann Wagner. She recommended that he engage Attorney Justin Maiona. Attorney Maiona filed a notice of appearance on the Debtor's behalf with the Probate Court on November 9, 2007. Attorney Maiona testified that he was hired by the Debtor "to try and extract a judgment from the Probate and Family Court" and that he was aware that the Debtor owed money to deBenedictis when he undertook his engagement. On November 13, 2007, Attorney Maiona sent a letter to the presiding judge in the modification proceeding in which he inquired about the timing of a final ruling.[1]

On December 14, 2007, the Probate Court (Stahlin, J.) issued a Modification Judgment (the "Judgment") which required the Debtor to pay Mrs. Dougherty, on or before March 1, 2008, alimony in the amount of $528,914.20, with interest. The Debtor considered the Judgment to be a total defeat and a "life-altering event." He was "horrified" by the

---

[1] Attorney Wagner testified that she drafted the letter.

amount he had to pay his ex-wife which, he testified, exceeded the value of his assets.

According to deBenedictis, the Probate Court found against the Debtor because it had

determined that the proceeds from the sale of his business constituted income, not a marital

asset.

The Debtor received notice of the Judgment on December 26 or 27, 2007. On

December 31, 2007, he notified deBenedictis by e-mail that he had stopped payment on the

Settlement Checks, which she still had not deposited. The e-mail provided, in part:

> Danielle, I wrote you two checks a number of months ago in full and final
> settlement. After you rejected my offer and changed the terms, I stopped
> payment because we had no agreement. As you know, I now have to handle
> a terrible and unexpected result. I will address the payment issue when the
> immediate crisis is under control. . . .

Conflicting evidence was presented at the trial regarding whether the parties had reached

an agreement on the final terms of a settlement of the fee dispute as of December 31, 2007

and, if so, whether the Debtor unilaterally breached the agreement when he stopped

payment on the Settlement Checks. The Debtor maintained that deBenedictis's request for

a mortgage on the property had never been resolved and that he stopped payment on the

Settlement Checks because he was confronted with a large judgment without the ability

to pay it. The Court finds that the parties never reached agreement on the final terms of

a settlement of the fee dispute. Following her receipt of the e-mail, deBenedictis consulted

with her own counsel and decided to initiate a collection action against the Debtor because

she was concerned that his assets would be dissipated.

On January 3, 2008, deBenedictis filed a Verified Complaint against the Debtor in

10

the Suffolk Superior Court, Department of the Trial Court entitled <u>deBenedictis v.</u> <u>Dougherty</u>, SUCV2008-008-0028, in which she alleged that the Debtor had breached the Fee Agreement. She supported her Verified Complaint with an affidavit in which she attested that she was owed a total of $116,665, consisting of unpaid legal fees, interest, attorney's fees and costs.    Also on January 3, 2008, deBenedictis filed a Motion for Approval of Trustee Process pursuant to Mass. Gen. Laws ch. 246, § 1, in which she named Moors & Cabot and PNC Bank, N.A. as Trustee Defendants.    Through this motion, she sought trustee process "of the goods, effects or credits of the [Debtor] in the amount of $116,665 in possession of Trustee Defendant Bank or Brokerage Firm."    On the same date, the Superior Court issued a Summons and Order of Notice to the Debtor which provided, in relevant part, the following:

> WE ALSO NOTIFY YOU that application has been made in said action, as appears in the complaint RE: trustee process and that a hearing upon such application shall be held . . . at the court house . . . on Monday [January 7, 2008] at two o'clock P.M. at which time you may appear and show cause why such application should not be granted.

The return of service on the Summons and Order of Notice indicated that the Suffolk County Sheriff's Department, by Deputy Sheriff George Sylva, served copies of the "Summons and Order of Notice, Verified Complaint, Cover Sheet, Motion, Affidavit in this action" on the Debtor by leaving them at his last and usual place of abode at 365 North Street, Boston, MA on January 3, 2008 at 5:20 p.m. The Debtor denied receiving service of these documents on that date and testified that he later received them by mail.

On January 7, 2008, following a hearing on that date, the Superior Court (Henry, J.)

endorsed the Trustee Process Motion: "Allowed. As I find that there is a reasonable likelihood of success on the merits and there is a risk that the funds or assets may be moved if the trustee process is not allowed."  Both the Debtor and deBenedictis testified that the Debtor did not appear at the hearing.  On the same date, the Superior Court issued a "Summons to Trustee" (the "Trustee Summons") to Moors & Cabot which, in pertinent part, provided:

> deBenedictis . . . may recover in an action brought against [the Debtor] in the Superior Court for Suffolk County, to the value of $116,665.00 (the amount authorized). Such goods, effects or credits are hereby attached.

According to the return of service on the Trustee Summons, the Suffolk County Sheriff's Department, by Deputy Sheriff John Cotter, served the Trustee Summons on Moors & Cabot at 3:20 PM on January 8, 2008 by delivery in hand to Michael Brown, Exec. VP in charge of business, and on the Debtor on January 9, 2008 "in the manner provided in Rule 5 of the Rules of Court."

Moors & Cabot is an investment firm with offices located in downtown Boston. John Ribertone ("Ribertone"), a compliance officer with Moors & Cabot, testified at trial. He stated that Moors & Cabot does not maintain copies of the fronts and backs of checks for monies withdrawn from its accounts or copies of canceled checks it issues.  In response to a document subpoena, he did produce a Receipt of Check Acknowledgment Form dated January 8, 2008 (the "Receipt") indicating that a check (Check No. 6350017018) was issued to the Debtor on that date from Account No. KWM-336846 in the amount of $148,315.  The Receipt contained the Debtor's signature and was initialed by a Moors & Cabot investment

12

adviser. Ribertone testified that the Receipt confirmed that the Moors & Cabot check was delivered to the Debtor in hand at the Moors & Cabot offices on January 8, 2008. The Debtor's monthly statement for that account, for the period of January 1, 2008 through January 31, 2008, was also introduced at trial (the "Statement"). The Statement confirmed that the Moors & Cabot Check No. 6350017018 was issued to the Debtor on January 8, 2008. Ribertone was unable to determine what time of day the Moors & Cabot check was issued or when the Debtor appeared at Moors & Cabot to pick it up.

Ribertone explained that Moors & Cabot is not a traditional bank but an investment firm and that a client would have to have sold securities or had cash in an account in order to obtain a bank check. The Statement reflected that the Debtor had cash or cash equivalents of ($76,583.96) and securities valued at $270,800 at the beginning of the statement period and that such amounts were $170.25 and $0.00, respectively, at the end of the Statement period. The Statement also reflected that the Debtor sold securities valued at $237,573.39 from his margin account on January 10, 2008.[2] Ribertone was unable to explain how the Debtor obtained the Moors & Cabot check on January 8th in advance of the stock sale and further testified that it typically takes about three days to fund a check request following the sale of securities. The Debtor, on the other hand, maintained that he sold stock in his investment account the day before he picked up the Moors & Cabot check,

---

[2] According to other portions of the record, the total sale proceeds from the stock sale were $237,455, less $89,140 owed by the Debtor for outstanding margin debt, leaving a balance of $148,315 which was the amount of the Moors & Cabot check issued to the Debtor. *See* Note 4 to the Debtor's Rule 59 Affidavit, *infra*.

January 7th.  deBenedictis did not adequately question the Debtor about the discrepancy between his testimony and the Statement which reflected a later sale date.  The details about the stock sale remain unclear.

As stated above, the return of service on the Trustee Summons reflected that Moors & Cabot received notice of the trustee process order on January 8, 2008 at 3:20 pm.  The Receipt, the Moors & Cabot Statement and the testimony of Ribertone all reflected that the Debtor withdrew funds on the same date, with no time of day specified.  deBenedictis did not question Ribertone about the timing of Moors & Cabot's receipt of the Trustee Summons and whether it had received the summons prior to releasing funds to the Debtor. Indeed, the parties stipulated in the Joint Pretrial Memorandum that "[t]here were no funds in the Moors & Cabot account at the time the Trustee Process Order was served by the Plaintiff."[3]

The Debtor also testified that he obtained the Moors & Cabot check on January 8, 2008.  After receiving the check, he testified, he delivered it to Attorney Maiona's office for "safekeeping" so the Probate Court could "decide how to distribute the monies . . . ."  He liquidated the Moors & Cabot account, he asserted, "to address the problem of dealing with the judgment. " He said that he believed Mrs. Dougherty had a greater ability to reach his assets than other creditors and that she had seized his retirement account and was "threatening to put a lien on my condominium to secure the judgment"  He also testified

---

[3] The parties did not amend the Joint Pretrial Memorandum after deBenedictis filed the Amended Complaint.

that he was advised by his broker sometime after he picked up the Moors & Cabot check

that there was a "freeze" on his brokerage account.  He mistakenly believed this had been

done by Mrs. Dougherty's counsel.  deBenedictis failed to adequately question him about

whether he knew about the Superior Court's trustee process order on January 8th when he

withdrew the Moors & Cabot funds.  When examined by the Court about whether he had

received service of deBenedictis's complaint and motion for trustee process on January 3,

2008, as attested to by the Suffolk County Deputy Sheriff, the Debtor reiterated that he had

not received service on that date and that he was unaware of her lawsuit at the time he sold

the stock.

Despite the documentary evidence which showed that the Debtor withdrew the

funds on January 8, 2008, deBenedictis recollected that the Debtor withdrew the funds on

the morning of the trustee process hearing, January 7th: "Shortly after [my attorney] found

out that the Moors & Cabot money had been taken on the very morning of the court

hearing for the trustee process. . . he was upset and he immediately noticed Mr.

Dougherty's deposition."  deBenedictis also made reference at trial to an answer filed by

Moors & Cabot in the Superior Court collection action in which it asserted that "the money

had been taken out that very same, the morning [of the hearing]." She did not introduce

the answer into evidence.[4]  Her recollection is inconsistent with the other documentary

evidence and the testimony of the Debtor and Ribertone.  Nonetheless, there is no dispute

_____

[4] Upon realizing that the answer was not in evidence, counsel to deBenedictis
indicated at trial that she would supplement the record.  She failed to do so.

15

that she obtained no funds from Moors & Cabot following the issuance of the trustee process order.

deBenedictis introduced Attorney Maiona's lawyer's trust account (the "IOLTA account") bank statement for the month of January, 2008.  That statement reflected that a deposit of $152,815 was made into the IOLTA account on January 9, 2008.  Consistent with the Debtor's testimony, Attorney Maiona testified that $148,315 of this deposit was given to him by the Debtor and that he understood that the funds came from the Debtor's Moors & Cabot account.

On January 10, 2008, Attorney Maiona filed with the Probate Court "Defendant's Rule 59 Motion to Open and Amend Modification Judgment, Stahlin, J., dated December 14, 2007" (the "Rule 59 Motion") through which the Debtor sought reconsideration of the Judgment.[5]  The Debtor supported the Rule 59 Motion with his own affidavit, also dated January 10, 2008, in which he asserted his inability to pay the Judgment.  In the affidavit, he listed his assets, including "sales proceeds of the remaining shares of stock, in the amount of $148,315."  In his affidavit, he averred:

> My assets, exclusive of my home, are not sufficient to pay the judgment . . .
> . In addition, Danielle deBenedictis, my former attorney, has sued me,
> claiming that I owe her $83,306 in attorney's fees and costs . . . . [She] filed a
> motion for trustee process in the amount of $116,665 . . . [She] has already
> obtained a freeze on my investment account.  As it happens, I had already
> withdrawn the proceeds of the sale of my stock, but I am very concerned that
> [she] will take further steps which will make the proceeds in the amount of
> $148,315 unavailable to pay the judgment in this case.

---

[5] deBenedictis filed a notice of withdrawal of her appearance for the Debtor in the Probate Court on January 3, 2008.

16

As is apparent from the affidavit, the Debtor and Attorney Maiona were aware of the

trustee process order of the Superior Court by at least January 10, 2008.  Attorney Maiona

did not serve a copy of the Rule 59 Motion or the affidavit on deBenedictis.

On or about January 23, 2008, the Probate Court conducted a hearing and issued a

Temporary Order which required that $60,000 of the funds held in the IOLTA account be

transferred to an interest bearing escrow account to be held by Attorney Maiona pending

further order of the court or a written agreement of the parties.  Attorney Maiona did not

inform deBenedictis about the hearing or the Temporary Order.  It is unclear from the

record whether the January 23rd hearing was conducted with respect to the Rule 59 Motion,

but Attorney Maiona testified that he never intended to defraud deBenedictis or anyone

else with respect to the Debtor's funds:

> I did not assist Mr. Dougherty in any attempt to defraud anyone.  In fact, [I]
> did quite the opposite and went to the Probate and Family Court and asked
> for their direction on what to do.
>
> ***
>
> That's why we were there in front of the Judge, . . . to get his instruction on
> what to do with the funds.

By letter dated January 30, 2008, at the Debtor's direction, Attorney Maiona sent him

a check in the amount of $75,615, representing the total deposited in the IOLTA account

($148,315), less the Probate Court ordered escrow ($60,000) and attorney's fees payable to

Attorney Maiona ($6,000), Attorney Steve Rosenberng ($3,500), who represented the Debtor

in the deBenedictis collection action, and Attorney Ann Wagner ($3,200).  The Debtor

testified that the "bulk" of the $75,615 he received was later paid to Mrs. Dougherty.

17

deBenedictis pursued her collection action against the Debtor in the Superior Court and eventually filed a motion for summary judgment, but the matter was stayed when the Debtor filed his bankruptcy petition on September 24, 2009.  deBenedictis never received a judgment against the Debtor in the collection action.

## IV. POSITIONS OF THE PARTIES

 A. <u>deBenedictis</u>

Notwithstanding the references to 11 U.S.C. § 523(a)(2) and (a)(15) in the Amended Complaint, deBenedictis now relies, as stated in her post-trial brief, solely on § 523(a)(6) as the basis for a determination that the fees owed to her are excepted from discharge.  She argues that the Debtor had, as of January 3, 2008, notice of the trustee process motion and the January 7, 2008 hearing.  She asserts that she obtained property rights in the Moors & Cabot funds as soon as the Debtor had notice that she would be seeking a trustee process attachment.  Accordingly, she maintains, the Debtor's liquidation of his account and the distributions of those funds after January 3rd constituted conversion of her property: "[Attorney] Maiona and [Attorney] Wagner were paid from the trustee processed funds belonging to deBenedictis which were converted by Dougherty and [Attorney] Maiona to Dougherty's use.  Even [Attorney] Rosenberg . . . was paid from the converted trustee processed funds."  She maintains that Attorney Maiona, who was aware of the trustee process attempt when he prepared the Debtor's Rule 59 Affidavit, breached Rule 1.15(c)

of the Massachusetts Rules of Professional Conduct, entitled "Safekeeping Property"[6] for

his interference with her interest in the funds and that the Debtor is responsible, based on

principles of agency, for the acts of Attorney Maiona.

With respect to the elements of 11 U.S.C. § 523(a)(6), deBenedictis argues that she

suffered injury when the Debtor and Attorney Maiona wrongly exercised control over the

Moors & Cabot funds and subsequently deposited them, beyond her reach, into the IOLTA

account: "They had no right to . . . these funds and thereby tortiously converted property

over which the Suffolk Superior Court had given deBenedictis dominion and control."

She asserts that the Debtor intended to cause her injury: "The record is clear that from the

moment that Dougherty received the . . . Probate Court judgment against him, he took

willful steps to not pay [her] any monies and to use what monies he had to pay for the

judgment . . . and pay his other creditors. . . ."  In support, she relies on the Debtor's Rule

59 Affidavit, in which he acknowledged that deBenedictis had obtained a "freeze" on his

investment account, and on a number of cases involving contempt of court orders,

including, <u>Siemer v. Nangle, (In re Nangle)</u>, 274 F3d 481 (8th Cir. 2001)(finding that a

debtor's conduct in disobeying a court order was willful and malicious because it was

"targeted at the creditor.").  She further argues that the Debtor had no valid excuse or

justification for his actions because he never disputed the amount owed to her.  She

maintains that the Debtor's actions were malicious because they were "targeted" at her,

---

[6] The Rule, provides, in part, the following: "Upon receiving trust funds or other
trust property in which a client or third person has an interest, a lawyer shall promptly
notify the client or third person. . . . "

relying on this Court's decision in <u>Liddell v. Peckham (In re Peckham)</u>, 442 B.R. 62, 81 (Bankr. D. Mass. 2010).  deBenedictis also appears to argue that the Debtor's stop payment order on the Settlement Checks amounted to an intention to cause her injury, although this would appear to contradict her brief in which she maintains the parties never agreed about whether there would be collateral for the Debtor's obligation to pay her sums in excess of the Settlement Checks.

B. <u>The Debtor</u>

The Debtor maintains that "by the time that Moors and Cabot was served with the trustee process attachment, the funds from the Account had been delivered to Mr. Dougherty . . . ."  Accordingly, he contends, deBenedictis had no property interest in the Moors & Cabot funds and no injury for purposes of 11 U.S.C. § 523(a)(6).  He also asserts that the Debtor did not intend any injury to her or act with malice because he withdrew the Moors & Cabot funds to make them available to pay the Judgment.

**V. DISCUSSION**

Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt that results from "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).  The terms "willful" and "malicious" are two distinct elements, and each must be proven to establish an exception to discharge. <u>Fischer v. Scarborough (In re Scarborough)</u>, 171 F.3d 638, 641 (8th Cir. 1999).  The Plaintiff bears the burden of proving that her claim is nondischargeable under § 523(a)(6) by a preponderance of the evidence. <u>Grogan v. Garner</u>, 498 U.S. 279, 287-88, 111 S. Ct. 654

(1991).

In <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 118 S. Ct. 974 (1998), the United States

Supreme Court addressed the definition of the term "willful." The Court determined that

the term "willful" modifies the word "injury" in § 523(a)(6) and, therefore,

"nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or

intentional *act* that leads to injury." <u>Id</u>. at 61 (emphasis in original). Thus, recklessly or

negligently inflicted injuries are not excepted from discharge under § 523(a)(6). <u>Id</u>. at 64.

In <u>Read & Lundy, Inc. v. Brier (In re Brier)</u>, 274 B.R. 37 (Bankr. D. Mass. 2002), this

Court reviewed post-<u>Geiger</u> case law with respect to the willful element of § 523(a)(6):

> In <u>McAlister v. Slosberg (In re Slosberg)</u>, 225 B.R. 9 (Bankr. D. Me. 1998), the
> bankruptcy court observed that [the Supreme Court in <u>Geiger</u>] . . . did not
> indicate whether the willfulness element includes "acts intentionally done
> and which are known by the actor to be '*substantially* certain to cause injury.'
> " <u>Id</u>. at 18 (emphasis in original). Noting that the "substantially certain"
> formulation had been adopted in most post- <u>Geiger</u> decisions, <u>id</u>. n.12, and
> is prominent in the Restatement (Second) of Torts § 8A, the bankruptcy court
> in <u>Slosberg</u> adopted that formulation. It concluded that "a debtor who
> intentionally acts in a manner he knows, or is substantially certain, will harm
> another may be considered to have intended the harm and, therefore, to have
> acted willfully within the meaning of § 523(a)(6)." <u>Id</u>. at 19 (footnote
> omitted).

<u>Brier</u>, 274 B.R. at 43-44.

The United States Court of Appeals for the First Circuit in <u>Printy v. Dean Witter</u>

<u>Reynolds, Inc</u>., 110 F.3d 853, 859 (1st Cir.1997), held that the element of malice in § 523(a)(6)

requires that the creditor show that the willful injury was caused without just cause or

excuse. In <u>Bauer v. Colokathis (In re Colokathis)</u>, 417 B.R. 150 (Bankr. D. Mass. 2009), this

Court construed <u>Geiger</u> and <u>Printy</u>, as well as post- <u>Geiger</u> cases such as <u>Slosberg</u> and

concluded that for an exception to discharge under 11 U.S.C. § 523(a)(6) to apply, the

creditor has the burden of showing that " . . . 1) the creditor suffered injury; 2) the debtor

intended to cause the injury or that there was substantial certainty that the injury would

occur; and 3) the debtor had no justification or excuse for the action resulting in injury."

<u>Id</u>. at 158.

deBenedictis asserts that her injury was the Debtor's conversion of her property,

namely the Moors & Cabot funds he withdrew to pay his other creditors.    In

Massachusetts, the tort of conversion "requires the exercise of dominion or control over

personal property of another." *See* <u>Third Nat'l Bank v. Continental Ins. Co.</u>, 388 Mass. 240,

244, 446 N.E.2d 380 (Mass. 1983); *see also* <u>Evergreen Marine Corp v. Six Consignments of</u>

<u>Frozen Scallops</u>, 4 F.3d 90, 95 (1st Cir. 1993)(discussing the elements of conversion under

Massachusetts law); <u>Gen. Elec. Co. Bus. Lighting Group v. Halmar Distributors, Inc. (In re</u>

<u>Halmar Distributors, Inc.)</u>, 232 B.R. 18, 22   (Bankr. D. Mass. 1999)("Conversion is the

wrongful exercise of dominion or control over the personal property, including money, of

another."); <u>Morrin v. Manning</u>, 205 Mass. 205, 211, 91 N.E. 308 (1910)(money may be the

subject of conversion). While a willful and malicious injury may include a conversion of

a creditor's property, *see* <u>Davis v. Aetna Acceptance Co.</u>, 293 U.S. 328, 332, 55 S.Ct. 151

(1934); <u>West Springfield M.E. Credit Union v. Finnie (In re Finnie)</u>, 10 B.R. 262, 263-64

(Bankr. D. Mass. 1981), the Court must first determine whether the Debtor exercised control

over deBenedictis's property when he withdrew the Moors & Cabot funds.  This requires

an examination of Massachusetts law with respect to remedy of trustee process.

"Trustee process is a statutory procedure . . . which enables a creditor to attach goods or credits of his debtor which are in the hands of a third person." Goodspeed's Book Shop, Inc. v. State Street Bank and Trust Co., 8 Mass. App. Ct. 147, 149, 391 N.E.2d 1262 (1979). The procedure is used to ensure that such property will be available for satisfaction of a judgment recovered by a creditor and is governed by Mass. Gen. Laws ch. 246, § 1 *et seq.* and Mass. R. Civ. P. 4.2.  The United States Court of Appeals for the First Circuit explained the prejudgment remedy of trustee process in Latorraca v. Taniki Fin. Corp., 393 Fed. Appx. 730 (1st Cir. 2010):

> Under Massachusetts law, a plaintiff may attach "goods, effects or credits" that belong to the defendant but are in the hands of a third party. Mass. Gen. Laws ch. 246, § 20. The trustee process, as it is called, has two key steps. First, the property must be secured by a trustee attachment, which is an interim remedy used to preserve the property so that it might later be taken on execution. *See* Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 15 F.3d 1222, 1229 (1st Cir. 1994). Second, the party holding the property must be "charged" as trustee, meaning that there must be a final determination that he does, in fact, hold the "goods, effects or credits" of the defendant.
>
> ***
>
> [O]nce the property is secured by an attachment, the focus shifts to whether the alleged trustee did, in fact, have "goods, effects or credits of the defendant in his hands or possession" at the time of the service of the trustee summons. L.S. Cushing, A Practical Treatise on the Trustee Process 93 (1833). To that end, the trustee must file an answer disclosing "plainly, fully and particularly what goods, effects or credits, if any, of the defendant" he possesses. Mass. Gen. Laws ch. 246, § 10. . . . If the court ultimately determines that the trustee holds "goods, effects or credits" of the defendant, the trustee will be "charged," judgment will enter against him, and he must then "pay over to the creditor or be subject to a trustee writ of execution." Gabovitch v. Lundy, 584 F.2d 559, 561 n.3 (1st Cir.1978); *see* Mass. Gen. Laws ch. 246, §§ 39–44.

Latorraca v. Taniki Fin. Corp., 393 Fed. Appx. at 731-32.  A plaintiff cannot by trustee process attach any money held by the trustee for the defendant unless the money was so held by the trustee at the exact time of service of the trustee summons.  *See* Mass. Gen. Laws ch. 246, § 32;  Singarella v. City of Boston, 330 Mass. 257, 260, 112 N.E.2d 809 (1953)("[W]hether a trustee is chargeable depends upon the facts as they existed at the time the trustee process was served."); *see also* Jordan v. Lavin, 319 Mass. 362, 365, 66 N.E.2d 41 (1946).  The burden is on the creditor applying for attachment to show that the trustee has in his possession the goods, effects or credits of the defendant. Jordan Marsh Co. v. Hale, 219 Mass. 495, 496, 107 N.E. 357 (1914).

The Superior Court allowed the trustee process motion on January 7, 2008.  Neither party introduced any evidence as to the exact time of the entry of the order, although the Summons and Order of Notice reflected that the hearing was scheduled for 2:00 PM. Presumably, the order was entered at the conclusion of or shortly after the hearing. According to the return of service on the Trustee Summons, deBenedictis did not effect service of it on Moors & Cabot until the afternoon of January 8th and on the Debtor until the following day, January 9th.  The Receipt, the Moors & Cabot account Statement and the testimony of Ribertone and the Debtor all confirm that the Debtor withdrew the Moors & Cabot funds on January 8, 2008, although no time of day was conclusively determined. deBenedictis never questioned Ribertone regarding whether Moors & Cabot released the funds to the Debtor after receipt of the Trustee Summons.  Moreover, she introduced no evidence indicating that she pursued Moors & Cabot for failing to comply with the Trustee

24

Summons or the order of the Superior Court or that she sought to "charge" it as trustee in compliance with Mass. Gen. Laws ch. 246.  The Court finds that deBenedictis failed to prove that the Debtor or Moors & Cabot had been served with the Trustee Summons prior to the Debtor's withdrawal of the funds.

The Debtor's receipt of service of deBenedictis's complaint and the trustee process motion on January 3, 2008 is immaterial because her request for an attachment was only pending at that time and did not have the force of a court order.  The mere filing by deBenedictis of the motion for trustee process did not create a property interest in the Debtor's account at Moors & Cabot.  While she completed the first step of the trustee process procedure, i.e., obtaining an order from the Superior Court to preserve any monies held in the Debtor's account, there simply were no funds left to preserve by the time she served the Trustee Summons.  As a result, she was unable to effect the second step of the process, namely charging the trustee.  Her attempt to capture the "credits" of the Debtor was late and ineffective because there was nothing "so held by the trustee" at the time of service of the Trustee Summons.  *See* Singarella v. City of Boston, 330 Mass. at 260.  She conceded as much in the Joint Pretrial Memorandum ("There were no funds in the Moors & Cabot account at the time the Trustee Process Order was served by the Plaintiff.").  There was no misappropriation or conversion of her property by the Debtor and no injury for that tort for purposes of 11 U.S.C. § 523(a)(6).

Alternatively, deBenedictis asserts that the Debtor's disbursement of the Moors & Cabot funds constituted a violation of the Superior Court's trustee process order and,

25

therefore, amounted to willful and malicious injury. She supports that argument with citation to cases involving contempt and § 523(a)(6) but with no real legal analysis of the issue. To the extent she relies on a contempt theory to establish a willful and malicious injury, the record simply does not support it. deBenedictis failed to establish that the Debtor was aware of the Superior Court's trustee process order at any time before he withdrew the Moors & Cabot funds as it is undisputed that he did not attend the January 7th hearing, and she did not question him about whether he was aware of the order when he withdrew the funds on January 8th. Based on the lack of evidentiary showing by deBenedictis, this Court cannot find that on January 8, 2008 the Debtor willfully interfered with, or attempted to thwart, the order of the Superior Court.

The earliest date the Debtor can be charged with knowledge of the trustee process order is January 9, 2008, when the Trustee Summons was served on him and when he reviewed and signed his Rule 59 Affidavit. By that date, the trustee process order, which was issued with respect to Moors & Cabot, was moot. deBenedictis did not seek or obtain an injunction from the Superior Court against the Debtor to prevent him from transferring the Moors & Cabot funds. That fact was implicitly recognized by the Probate Court when it ordered the Debtor to segregate $60,000 from the $148,315 deposited in the IOLTA account while it was aware of deBenedictis's attempted "freeze" on the investment account. Further, there is no evidence that deBenedictis sought a contempt judgment against the Debtor during the pendency of the Superior Court collection action. This is likely for the same reason that she cannot assert contempt against him here: he withdrew

26

the funds before she served the Trustee Summons on him or Moors & Cabot.

Even were this Court to find that the Debtor was in contempt of the Superior Court order when he distributed the Moors & Cabot funds to his other creditors, a debtor's failure or refusal to obey a court order, alone, is not necessarily determinative of a finding of willful and malicious injury under § 523(a)(6).  This is especially true, where, as here, there is no evidence of a state court contempt judgment against the Debtor.  In  Liddell v. Peckham (In re Peckham), 442 B.R. 62 (Bankr. D. Mass. 2010), this Court noted that "courts addressing the issue of whether contempt judgments are nondischargeable are not uniform in their analysis" and concluded that "the case law is fact driven, and the holdings in the decisions . . . often are the result of both egregious and affirmative misconduct by debtors in contravention of court orders or injunctions. . . ."  Id. at 84. In that case, this Court considered whether a debtor willfully and maliciously injured the plaintiff by failing to respond to discovery in aid of execution of the plaintiff's judgment and subjecting himself to contempt and civil arrest.  The Court determined that the debtor's contravention of court orders was not the result of egregious and affirmative misconduct but rather the result of the "virtual paralysis" of the debtor who suffered from depression and who "buried his head in the sand and presumably hoped that the whole matter would go away."  Id. at 87.

The Debtor here did not suffer from virtual paralysis, but, like Mr. Peckham, he did lack the requisite intent to injure and malice necessary for a determination of nondischargeability under § 523(a)(6).  Upon learning of the Judgment, which he did not have the assets to satisfy, he took swift action to pool and disclose his assets to the Probate

Court and to pay his new attorneys, some of whom were seeking a reduction of the Judgment.   The Court finds that his actions were motivated more by his perceived need to quickly address the sizeable Judgment entered against him and to preserve his assets to satisfy it, rather than a desire to harm deBenedictis.   This is less than a showing of egregious misconduct, and the Court cannot conclude from these facts that he intended to injure deBenedictis or that he had no justification or excuse for his actions.   *See* Trenwick America Reinsurance Corp. v. Swasey (In re Swasey), 488 B.R. 22 (Bankr. D. Mass. 2013). The Debtor did attempt to settle the fee dispute with deBenedictis until the Judgment issued and the pressures he felt to address it altered his immediate priorities.   As he stated in his December 31, 2007 e-mail to her: "I will address the payment issue when the immediate crisis is under control."   Although unfortunate for deBenedictis, a race to satisfy competing claims from limited assets is a common scenario preceding a debtor's decision to seek bankruptcy protection. At best, the Debtor's actions were closer to the reckless standard of conduct decried by Geiger, 523 U.S. at 62 (1998), and were not willful and malicious.

The Court finds that deBenedictis failed to sustain her burden in establishing the first element of the "willful" injury test of § 523(a)(6), i.e., that she suffered an injury based upon conversion as she did have a property interest in the Moors & Cabot funds at the operative moment when the Debtor withdrew them.   Any alleged breach by Attorney Maiona of the Rules of Professional Conduct does not enhance deBenedictis's ability to establish an injury for purposes of § 523(a)(6). To the extent she believes she has grounds

28

for a claim against him for breaching the Rules of Professional Conduct, she is free to pursue it in the appropriate forum. deBenedictis's alternative theory of contempt is not supported by the record and otherwise fails to satisfy the remaining elements of § 523(a)(6), namely intent to injure and malice.

Notwithstanding the result here, the Court is mindful of the substantial services rendered by deBenedictis to the Debtor who, when financially overwhelmed with the consequences of an unfavorable result, paid other creditors instead of her. deBenedictis's frustration with the Debtor's conduct is understandable given the role he and Attorney Vacarelli played in driving up the costs of litigation, the parties' ultimate inability to agree on the final terms of a settlement which would have allowed her to recoup some of what she was owed, and the Debtor's decision to pay his new attorneys instead of her. deBenedictis established merely that the Debtor breached his Fee Agreement with her. The cases are split on the question of whether, after Geiger, an intentional breach of contract can constitute a willful and malicious injury. *See* 2 NANCY C. DREHER ET. AL., BANKRUPTCY LAW MANUAL § 8:11 (5th ed. 2013)(footnotes omitted). Some courts require a breach of contract to be accompanied by tortious conduct that gives rise to a willful and malicious injury. S*ee* Petralia v. Jercich (In re Jercich), 238 F.3d 1202, 1206 (9th Cir. 2001), *cert. denied*, 533 U.S. 930, 121 S.Ct. 2552 (2001)(to be excepted from discharge "a breach of contract must be accompanied by some form of 'tortious conduct' that gives rise to 'willful and malicious injury.'"). Others do not require tortious conduct as an essential element for nondischargeability under § 523(a)(6). *See* Williams v. Int'l Bhd of Elec.

29

Workers Local 520 (In re Williams), 337 F3d 504, 510 (5th Cir. 2003)(court held that a willful and malicious breach of contract may give rise to a nondischargeable debt under § 523(a)(6) if liability results from an intentional or substantially certain injury, even if the conduct is not accompanied by an independent tort).  This Court need not decide on which side of the split it falls where, as here, deBenedictis failed to establish the elements of the tort she alleged, conversion, and where she otherwise failed to establish that the Debtor breached the Fee Agreement with intent to harm her or with the requisite malice under 11 U.S.C. § 523(a)(6).

## VI. CONCLUSION

For all of the above stated reasons, the Court finds that deBenedictis failed to establish by a preponderance of the evidence that the debt owed to her is the result of willful and malicious injury by the Debtor under 11 U.S.C. § 523(a)(6).  Based upon her sole reliance on § 523(a)(6) in her post-trial brief and the rulings made by the Court on the first day of trial, the Court finds that deBenedictis has waived reliance on any other subsection of § 523(a), including § 523(a)(2) and (a) (15).  deBenedictis's request for attorney's fees, costs and interest is denied.   The Court shall enter judgment in favor of the Debtor.

By the Court,

Joan N. Feeney

Dated: March 11, 2014          Joan N. Feeney
                               United States Bankruptcy Judge

30